UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**CEDAE HARDY,**<br><br>**Defendant** | Case No. 23-CR-296 (RJL) |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its motion that Defendant Cedae Hardy be detained pending trial pursuant to 18 U.S.C. §§ 3142(f)(1)(A) (Crime of Violence) of the federal bail statute. The indictment charges Mr. Hardy with committing six separate armed carjackings around the District of Columbia and Maryland and identifies another attempted carjacking where he shot the victim multiple times. At the time of each of these offenses, Mr. Hardy was under pretrial supervision. He poses a significant danger to the community. And considering the factors specified under 18 U.S.C. § 3142(g), Mr. Hardy cannot overcome the statutory presumption that no condition or combination of conditions will reasonably assure the safety of the community.

**BACKGROUND**

On August 29, 2023, a Grand Jury for the United States District Court for the District of Columbia returned an indictment charging Mr. Hardy with Conspiracy to Commit Carjacking, in violation of 18 U.S.C. § 371, six counts of Carjacking, in violation of 18 U.S.C. § 2119, six counts of Brandishing a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), three counts of Transportation of Stolen Goods Across State Lines, in violation of 18 U.S.C. §

2314, and two counts of Selling Stolen Vehicles, in violation of 18 U.S.C. § 2313. An initial appearance was held before the Honorable Magistrate Judge Zia Faruqui on August 31, 2023. At that hearing, the Government moved for Mr. Hardy's detention pending trial.

### *The Instant Offense*

In March 2023, undercover officers with the Metropolitan Police Department (MPD) were introduced to a broker of stolen and carjacked vehicles, identified in the indictment as Co-Conspirator 1. Co-Conspirator 1 operated out of the parking garage adjoining the apartment complex located at 1326 Florida Avenue, Northeast, Washington, D.C. (the "Florida Avenue Garage"). From March 28, 2023, through April 27, 2023, undercover officers purchased nine vehicles from Co-Conspirator 1—eight of which were taken in armed carjackings. Four of the vehicles taken in armed carjackings on April 7th, 8th, 9th, and 23rd were supplied to Co-Conspirator 1 by Mr. Hardy.

In each of those instances, the victims were alone in or around their vehicles when a single suspect, believed to be Mr. Hardy, approached on foot. In each instance, Mr. Hardy pointed a firearm at the victims and demanded their keys and cell phones. Each victim felt at fear for their lives. In the April 9th carjacking, the victim reported that Mr. Hardy threatened to shoot the victim if he did not give Mr. Hardy his car keys, and in the April 23rd carjacking, Hardy reportedly threatened the victim's life if she did not comply with his demands. In each instance, the victim relinquished his or her keys, and Mr. Hardy drove off in the victim's vehicle. Within an hour, the vehicle arrived at the Florida Avenue Garage, and a single suspect matching the general description provided by the victim exited the vehicle. As noted previously, Co-Conspirator 1 sold each of the four carjacked vehicles to undercover officers with MPD.

In addition to the four successful armed carjackings that Mr. Hardy completed in furtherance of the charged conspiracy, the indictment also identifies an attempted carjacking committed by Mr. Hardy as part of the conspiracy. On April 18, 2023, A.W., a driver for Lyft, was sitting in front of 2502 Queens Chapel Road, Hyattsville, Maryland, looking for a ride to pick up. Mr. Hardy entered the front passenger seat, brandished a firearm, and began to yell at A.W.  A.W. was unable to understand Mr. Hardy and attempted to push him out of the vehicle, at which point Mr. Hardy fired multiple rounds striking A.W. in the forearm and abdomen.  Mr. Hardy exited the vehicle and fled back to Washington, D.C.

Co-Conspirator 1 was arrested on May 17, 2023, and charged in D.C. Superior Court with, *inter alia*, two counts of Armed Carjacking.  However, despite Co-Conspirator 1's arrest, Mr. Hardy continued to commit carjackings.  On May 26, 2023, I.S. was sitting inside her 2020 Audi Q3, when Mr. Hardy entered her back seat.  Mr. Hardy pulled out a firearm with an extended magazine and demanded I.S.'s keys.  When I.S. could not find them initially, Mr. Hardy moved himself forward and held the gun to I.S.'s chest.  I.S. provided her keys and phone, but Mr. Hardy reportedly told the victim to drive.  I.S. jumped out of the vehicle, at which point Mr. Hardy entered the driver's seat and drove I.S.'s vehicle from the location of the carjacking in Hyattsville back to Washington, D.C.  I.S. was able to track her stolen cell phone, which was recovered within approximately 30-45 minutes in the direct vicinity of the home of Mr. Hardy's girlfriend.

Just two and a half weeks later, on June 14, 2023, M.G. was loading her two young children in the back seat of her 2018 BMW X3.  Mr. Hardy approached M.G. and demanded, "Give me your phones and take the kids out of the car."  At first, M.G. refused.  Mr. Hardy proceeded to point a handgun  at M.G.'s abdomen.  M.G. began to scream and pulled her children out of

3

the vehicle.   Mr. Hardy ran to the driver's seat and sped away in M.G.'s BMW.

M.G.'s husband was able to track M.G.'s stolen phone and provide the location to police. MPD's helicopter—Falcon—located M.G.'s vehicle less than an hour after the carjacking in the 3600 block of 16th Street, Northwest.   The officer in Falcon observed the BMW traveling at a high rate of speed, and at the intersection of Arkansas Avenue and Iowa Avenue, Northwest, the vehicle collided with a vehicle occupied by a father and his two minor children.



**Figure 1 – M.G.'s vehicle after the crash**

Mr. Hardy and another individual, Malik Norman, fled from the vehicle after the crash. Mr. Hardy attempted to enter the home of another individual, A.L., after the crash to avoid detection. A.L. chased Mr. Hardy out of his home and yard. A.L. observed Mr. Hardy with a firearm and observed him toss it.   A.L. directed officers to Mr. Hardy and to the area where the firearm—a Glock 17 with an extended magazine—was eventually recovered. Mr. Hardy was in possession of M.G.'s two stolen cell phones and the keys to the BMW.

**ARGUMENT**

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e). The Act provides, however, for certain crimes, that there is a rebuttable presumption that no conditions or combinations of conditions will assure the safety of the community. *See id.* As is relevant to this case, the Act provides rebuttable presumptions for cases where there is probable cause to believe the defendant committed an offense under 18 U.S.C. § 924(c). *Id*. § 3142(e)(3)(B) "For purposes of making that determination, a grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." *United States v. Taylor*, 289 F. Supp. 3d 55, 62–63 (D.D.C. 2018) (internal quotations omitted).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.  *See* 18 U.S.C. § 3142(g).

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."  18 U.S.C. § 3142(f).  Specifically, the presentation of hearsay evidence is permitted and the government may proceed by proffer.  *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996).  Moreover, the government is not required to "spell out in precise detail how the

government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues. *See Smith*, 79 F.3d at 1210, *see Williams*, 798 F. Supp. at 36.

Because Mr. Hardy is charged with six separate violations of 18 U.S.C. 924(c)(1)(A)(ii), the Court must presume that no condition or combination of conditions will reasonably assure the safety of the community. A review of the 3142(g) factors makes clear that the defense cannot overcome these presumptions.

**I.      The Nature and Circumstances of this Offense Merits Detention.**

In considering the nature and circumstances of the offense, the statute specifically directs the Court to consider whether the defendant is charged with a crime of violence or offenses involving firearms. 18 U.S.C. § 3142(g)(1). Mr. Hardy stands charged with six distinct crimes of violence, and in each instance, Mr. Hardy is alleged to have brandished a firearm and pointed it at the victims. These victims were going about their daily lives. One, a dentist, was on her way to work. Another was coming home from church. And yet another was buckling her young children into their car seats.

As described by Judge Berman Jackson in *United States v. Lee*, "[t]he best outcome, if everything goes as planned during an armed robbery, involves a victim's being placed at risk and feeling terrified for his safety, possibly for years to come, and if things go wrong, someone—or multiple people—could be killed or seriously injured." 195 F.Supp.3d 120, 129 (D.D.C. 2016) (finding the nature and circumstances weighing heavily in favor of detention in a case where a

single Hobb's Act robbery was charged). Unfortunately for A.W., the victim of the April 18th attempted carjacking, things did go wrong, resulting in Mr. Hardy shooting him multiple times. Put simply, Mr. Hardy was profiting off of what was no doubt one of the worst days of these victims' lives.

The crimes with which Mr. Hardy is charged are undoubtedly serious and the breadth of the criminal conduct is staggering. As such, the nature and circumstances of this offense weighs heavily in favor of detention.

## II.     The Weight of the Evidence Against the Defendant is Formidable.

The second factor to be considered, the weight of the evidence, also weighs in favor of detention.[1]   The Government's case against Mr. Hardy is very strong.

### I.     *The April 7th, 8th, 9th, and 23rd Carjackings*

For the armed carjackings on April 7th, 8th, 9th, and 23rd, law enforcement had access to the surveillance footage from the Florida Avenue Garage.  The approximate drivetime between the location of the carjackings and 1326 Florida Avenue, Northeast, is consistent with when we see the victims' vehicles enter the garage. In each instance, the surveillance shows a single suspect matching the victim's general description of the carjacker exit the driver's seat wearing a black

---

[1] While some judges in this Court have indicated that this factor should be given less weight, in *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors."  2023 WL 1778194, at *8.  Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate."  *Id.* at *10.   In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision.  *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023).   The Second Circuit reached the same decision after a thorough and careful analysis of the issue.  *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight than any other factor.

jacket with a circular patch on the left sleeve.



**Figure 2**

Mr. Hardy's cell phone contained an image of him wearing a black jacket with a circular patch consistent with the one seen on the Florida Avenue Garage surveillance (Figure 3) and that jacket was recovered during a search warrant of his residence (Figure 4).



**Figure 3**                                                **Figure 4**

Just minutes after the April 7th carjacking of a BMW, Mr. Hardy is believed to have posted an Instagram Story on his account "448peso_."[2] The story shows an individual, who appears to be Mr. Hardy driving a BMW wearing a camouflage ski mask.



**Figure 5**

The BMW appears to be consistent with the victim's carjacked vehicle, particularly the dashboard configuration, the unique two-tone coloring, and the Virginia registration indicating it expires in June.

---

[2] "Peso" and "Cequan Peso" are nicknames frequently used by Mr. Hardy. And the word "Peso" is tattooed across the front of his neck.



**Figure 6 – comparing the victim's recovered vehicle (left) with two still frames from Mr. Hardy's Instagram**

The individual dropping off the carjacked vehicles from the April 9th and April 23rd carjackings can also be seen wearing a camouflage ski mask (Figure 7). And a camouflage ski mask was recovered during the search warrant of Mr. Hardy's residence (Figure 8).



                **Figure 7**                      **Figure 8**

Additionally, the communications between Mr. Hardy and his unnamed co-conspirators are particularly damning. On April 5, 2023, Co-Conspirator 1 texted Mr. Hardy, "Yo Ion want no Kia or nun."   Then, approximately thirty minutes prior to the April 7th carjacking, Mr. Hardy and

10

Co-Conspirator 1 have a phone call lasting one minute and twelve seconds. Seventeen minutes after the carjacking, Mr. Hardy texts Co-Conspirator 1, "Send the lo." To which, he responds, "1326 Florida ave ne." Mr. Hardy indicates that he is on his way and eventually says, "I'm outside." Just over an hour after the carjacking, Co-Conspirator 1 sends Mr. Hardy $40 over CashApp.

Later in the evening, Mr. Hardy (labeled in Figure 9 as "Peso") and Co-Conspirator 1 engage in a conversation where they appear to negotiate the prices for future carjacked vehicles that Mr. Hardy would bring to the garage.



**Figure 9**

Over the coming days and weeks, Mr. Hardy and Co-Conspirator 1 continued to have incriminating conversations around the times of the carjackings. For example, on April 8th—approximately three hours prior to the carjacking—Mr. Hardy and Co-Conspirator 1 have the following conversation:

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 4/8/2023 | 5:02 PM | CC1 | HARDY | Let me know when u go outside so I can head back to the city |
| 4/8/2023 | 5:03 PM | HARDY | CC1 | I'm outside now you can be on your way. Let's get money my boy |
| 4/8/2023 | 5:04 PM | CC1 | HARDY | That's a bet |
| 4/8/2023 | 5:04 PM | HARDY | CC1 | Lmk when you inna city |
| 4/8/2023 | 5:23 PM | CC1 | HARDY | I'm Otw to the spot now |
| 4/8/2023 | 5:31 PM | HARDY | CC1 | Bet hit me when you touchdown |
| 4/8/2023 | 5:31 PM | CC1 | HARDY | I'm 5 away |
| 4/8/2023 | 5:38 PM | HARDY | CC1 | Dats a bet I'm boutta get sum & bring it straight to you |

On April 9th, approximately one minute after the armed carjacking, Mr. Hardy sends Co-Conspirator 1 a text message stating, "Call me." Thirty minutes after the suspect believed to be Mr. Hardy arrives at the garage, Mr. Hardy sends a text to Co-Conspirator 1 stating, "Wya." To which, he responds, "In route to you." Co-Conspirator 1's cell site location data shows his device traveling to the area of the Florida Avenue Garage during this time period. Then, approximately an hour and a half after the armed carjacking, Co-Conspirator 1 sends two $400 payments to Mr. Hardy via CashApp.

For the April 23rd carjacking, Co-Conspirator 1 texted Mr. Hardy approximately four hours before the carjacking, "You going out today?" He further stated, "If u score today I'll give you a diddy and 5." Later that day, seven minutes after the suspect believed to be Mr. Hardy entered the Florida Avenue Garage in the carjacked vehicle, Mr. Hardy placed a call to Co-Conspirator 1. Verizon cellular tower data showed that Mr. Hardy's device utilized a cellular tower servicing the Florida Avenue Garage at the time of that call.

Finally, the stolen cell phone from the victim of the April 8th carjacking, L.P., was located at Mr. Hardy's girlfriend's residence during the execution of a search warrant, further confirming that Mr. Hardy is the individual seen on the surveillance at the Florida Avenue Garage.

II.     *The April 18th Shooting*

Mr. Hardy is linked to the April 18th shooting by ballistics evidence, location data, and incriminating web searches following the shooting. During Mr. Hardy's arrest on June 14, 2023, officers recovered a Glock 17 with serial number BCBT166. Moreover, Mr. Hardy's cell phone contains a video dated April 29, 2023, where that gun and its serial number is legible.



**Figure 10 – Screenshot from video on Mr. Hardy's device showing Glock 17 with SN BCBT166**

After the recovery on June 14th, the Glock 17 was test fired, and the spent shell casings were entered into the National Integrated Ballistic Information Network (NIBIN). NIBIN found a potential link between the recovered cartridge casings from the April 18th shooting and those from the test fire of the Glock 17.[3]

Location data further supports Mr. Hardy's involvement in the shooting. A review of location data from Mr. Hardy's device shows that five minutes after the shooting, Mr. Hardy's device was approximately .1 miles away.

---

[3] The government is in the process of submitting this evidence to a ballistics expert for formal comparison.



**Figure 11**

In fact, Mr. Hardy's device shows a FaceTime log entry almost immediately after the shooting. While the device does not show recipient information for the FaceTime log entry, the next communication on Mr. Hardy's device was to send Co-Conspirator 1 his location via a text message. He continued to send Co-Conspirator 1 his locations for the next twenty minutes as he traveled back to Washington, D.C. and sent Co-Conspirator 1 multiple text messages to include, "You see where I'm going?" and "I hopped on the bus."

Then, approximately an hour after the shooting, Mr. Hardy searched on his device, "how to get gun powder off hands." Approximately two and a half hours after the shooting, Mr. Hardy searched, "why do you wash hands after shooting." The next day, Mr. Hardy searched "man shot in Hyattsville md," and he accessed the Hyattsville Police Department's official website.

III.    The May 26th Carjackings

I.S. reported that her stolen Audi Q3 had Maryland license plate 5EM5425. Approximately 15-20 minutes after the armed carjacking, Mr. Hardy's cell phone contains numerous photographs of the Audi where the license plate 5EM5425 is clearly visible.



**Figures 12 and 13**

Shortly thereafter, there was an incoming call on Mr. Hardy's device from his girlfriend. As noted above, I.S.'s vehicle was recovered 30-45 minutes after the carjacking in the direct vicinity of the home of Mr. Hardy's girlfriend. Mr. Hardy's device shows that he was spending a significant amount of time at his girlfriend's house during this period. And during the execution of a search warrant on his girlfriend's home, law enforcement recovered credit and debit cards belonging to I.S., along with her backpack and a pair of athletic shorts—both of which were in her stolen vehicle.

IV.     *The June 14th Carjacking*

On June 14th, Mr. Hardy was seen fleeing from the crashed carjacked vehicle less than an hour after the carjacking. He was seen tossing a firearm, which was eventually recovered and linked via the serial number in a video on Mr. Hardy's device. Moreover, he was in possession of the victim's cell phones and car keys at the time of Mr. Hardy's arrest. One plausible defense for Mr. Hardy would be that Mr. Norman was actually the carjacker. However, this is foreclosed by evidence on Mr. Hardy's cell phone. Mr. Hardy calls Mr. Norman almost immediately following

15

the carjacking. Mr. Norman then sends a message with the address 1447 Oak Street, Northwest. Just over twenty minutes later, Mr. Hardy sends Mr. Norman a text stating, "Come outside" and surveillance footage from the area shows an individual who appears to be Mr. Norman leaving 1447 Oak Street around that time.



**Figure 13**

\*       \*       \*       \*

Plainly, there is significant evidence that Mr. Hardy committed the serious offenses with which he is charged, including shooting A.W. multiple times. This factor also weighs heavily in favor of detention.

### III.     The Defendant's History and Characteristics also Favor Detention.

The third factor for the Court to consider is Mr. Hardy's history and characteristics. Mr. Hardy, who is 18, has no prior criminal convictions. However, Mr. Hardy was under pretrial supervision in D.C. Superior Court case 2023-CF2-471 at the time of every offense he is alleged

to have committed.

In 2023-CF2-471, Mr. Hardy and another individual were in a BMW that had been carjacked four days earlier when Capitol Police officers attempted to make traffic stop. The BMW fled, leading officers on a chase that resulted in two Capitol Police vehicles being hit and causing minor injuries to an officer. Eventually, Mr. Hardy and the other individual fled from the vehicle and hid out in an outdoor freezer behind 303 Pennsylvania Avenue, Southeast. Officers stopped Mr. Hardy, who was in possession of a large capacity magazine. A firearm was found nearby, and DNA evidence links Mr. Hardy to the firearm.

Mr. Hardy faces firearms related charges in that case. He was initially preventively detained but released after a preliminary hearing on January 27, 2023. Mr. Hardy was under pretrial supervision from then until his arrest on June 14, 2023. Mr. Hardy was specifically ordered to not possess any firearms. And yet, in addition to the charged conduct involving the use of firearms, his cell phone also contained numerous images dated after his January arrest where Mr. Hardy is in possession of firearms.

  

**Figure 14**                **Figure 15**                **Figure 16**

In this case, Mr. Hardy's lack of criminal history does not tell the whole story. In fact, even the indictment in this case does not encompass the full breadth of criminal conduct that Mr. Hardy is likely involved in. Law enforcement is still investigating the evidence that was recovered from Mr. Hardy's girlfriend's residence during the execution of a search warrant. However, in addition to the L.P.'s and I.S.'s property recovered from the residence, law enforcement has thus far found property belonging to victims of three additional carjackings not charged in the indictment.

This factor, too, weighs in favor of detention.

## IV.     The Defendant Presents a Danger to Our Community.

Mr. Hardy is clearly dangerous. The facts of this case, along with his pending case and the evidence from his cell phone, make clear that he is someone who possesses guns, uses them to commit violent crimes, and recklessly tries to evade arrest. Mr. Hardy victimizes indiscriminately with the affected individuals in this case alone spanning from a toddler to senior citizens. His willingness to commit carjackings alone and on foot, only makes him more dangerous. And the evidence in this case suggests that if a victim tries to resist, he is willing to use deadly force.

Furthermore, as noted, the charges in this case give rise to a presumption that there is no combination of conditions that can assure the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(B); *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (establishing that the indictment alone triggers the rebuttable presumption). These rebuttable presumptions underscore that Congress sought to treat such crimes extremely seriously, particularly in light of the mandatory-minimum terms of incarceration accompanying such transgressions.

Moreover, these presumptions shift the burden of production appropriately to the defense to rebut the presumption itself. *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991) ("When

18

a defendant produces such evidence, however, the presumption does not disappear. The burden of persuasion remains on the government and the rebutted presumption retains evidentiary weight" (citations omitted)); *United States v. Ali*, 793 F.Supp.2d 386, 388 n. 2 (D.D.C. 2011). Here, that all of Mr. Hardy's alleged crimes took place while he was under supervision underscores that pretrial release puts the community at too grave a risk. For these reasons, the government submits that the Court should order the defendant's detention during the pendency of this case to protect the community.

## CONCLUSION

The government respectfully requests that the Court issue an Order granting its motion that the defendant be held without bond pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:  /s/ *Joshua Gold*
Joshua Gold
Tx Bar No. 24103101
Cameron Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
Federal Major Crimes Section
United States Attorney's Office for D.C.
601 D Street NW, Fifth Floor
Washington, D.C. 20530
E-mail: Joshua.Gold@usdoj.gov
Telephone: (202) 815-8965